NOT DESIGNATED FOR PUBLICATION

No. 121,666

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.W., a Minor Child.

MEMORANDUM OPINION

Appeal from Reno District Court; PATRICIA MACKE DICK, judge. Opinion filed July 17, 2020.
Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for
appellant.

*Jennifer L. Harper*, assistant district attorney, and *Keith E. Schroeder*, district attorney, for
appellee.

Before HILL, P.J., GREEN and WARNER, JJ.

PER CURIAM: The mother of A.W. appeals a district court's order terminating her
parental rights to the child. Basically, she argues that there is insufficient evidence to
prove that she is unfit, that the child agency made no reasonable efforts to help her, and
that the court failed to decide whether severance of her rights was in A.W.'s best
interests. Our review of the record and consideration of the legal arguments from both
sides leads us to find no errors here. The evidence is sufficient, and termination of her
parental rights was in the best interests of A.W. We affirm.

1

*Concerns about abuse arise at school.*

When A.W. went to his kindergarten class in November 2017, his teacher became concerned. The police were called. A.W. told his kindergarten teacher and others at the school that his mother and her boyfriend, M.R., were mad at him because he got up, so M.R. hit him. Police saw bruising under A.W.'s left eye and abrasions on his left cheekbone, jaw, and ear area. Later, police also noticed several recent scratches that looked like fingernail scratches on A.W.'s back, as well as a scratch on his left chest and shoulder area. He had a circular bruise on his right buttock. A.W. said he was scared of M.R. because M.R. hurt and kicked him.

Mother told police that A.W. was acting out when he should have been in bed so M.R. disciplined him. Mother said she heard from her room downstairs M.R. spanking A.W. She was not concerned. Mother told police that M.R. "has a tendency to, 'go [too] hard' when spanking [A.W.]." Mother also told police that there was another report from January 2017, which reflected excessive bruising. A.W.'s daycare center notified police of that incident. After the January incident, Mother told police she was aware of the bruising and M.R. may have spanked A.W. "a little too hard yesterday for lying to him." Mother explained M.R. went "overboard."

M.R. told police he heard A.W. playing in his room when he was supposed to be asleep. He went upstairs to discipline him and spanked A.W. five to ten times. He acknowledged the spanking may have been excessive, either by hitting him too hard or by too many spanks. Police arrested M.R. for child abuse.

The police took A.W. into protective custody. He was five years old. The State later filed a child in need of care petition. The district court removed A.W. from Mother's custody and granted temporary emergency custody to the Secretary of the Department for Children and Families. The district court specified this was in the best interests of A.W.'s

safety and found, "There are concerns that the mother will not be able to protect the child as it appears she does not understand the severity of the situation."

We note that A.W. has not returned to Mother's custody since his removal in late 2017.

When the matter finally came to court, Mother stated that while she neither admitted nor denied the claims in the petition, she did not contest them. Even so, she stated that she understood the court might find the claims in the petition were true.

The court accepted Mother's no contest statement and found A.W. was without adequate parental care, control, or subsistence, and the condition was not due solely to the lack of financial means of the child's parents. The court also found that A.W. was without the care or control necessary for his physical, mental, or emotional health, and he had been physically, mentally, or emotionally abused or neglected, or sexually abused. The court adjudicated A.W. to be a child in need of care.

The initial case plan goal was reintegration of A.W. back into Mother's home. St. Francis Community Services became involved to help with reintegration. In December 2017, the primary safety concern for A.W. was Mother continuing to live with M.R. The case plan goals to accomplish reintegration specified that Mother was required to:

- complete a psychological evaluation with I.Q. testing, and follow any recommendations;
- find stable housing and provide to St. Francis monthly rent receipts;
- establish utilities and provide to St. Francis monthly proof that the utilities were in her name;
- secure employment and provide to St. Francis monthly paystubs;
- sign all necessary releases;

3

- ensure that only those approved by St. Francis would have contact with A.W.;
- ensure that A.W. was not physically disciplined by anyone under any circumstances;
- ensure that anyone living or spending a significant amount of time in the home with Mother or A.W. would submit to background checks and drug testing, if requested by St. Francis;
- ensure that anyone over 18 years old and living in the home complete all assigned case plan tasks;
- complete a parenting class and provide verification to St. Francis;
- show and use learned parenting skills during visits with A.W.; and
- engage in individual therapy.

As time passed, the case plan fell apart. Mother, pregnant with M.R,'s child, moved to Colorado. Her father, J.H., moved to Hutchison from Germany and A.W. was eventually placed with him. After the birth of her second child, Mother moved to Florida. After that, she moved to Germany.

At a permanency hearing in October 2018, the court wanted to see what progress had been made toward the goal of reintegration. Mother did not appear in person, but by her attorney. J.H. was present with his attorney. The district court considered both in-state and out-of-state placement options and determined that in-state placement continued to be in A.W.'s best interests. The court found that appropriate agencies made reasonable efforts to assist and support the family to accomplish reintegration, but that plan was no longer adequate. Finding reintegration was no longer a feasible goal, the court noted that adoption or permanent custodianship might be in A.W.'s best interests and ordered the State to file a pleading to terminate parental rights. The court left its prior custody orders in effect.

*Two witnesses testified at the termination hearing.*

Erica Romero testified for the State. Mother testified on her own behalf.

*Mother failed to complete case plan tasks.*

Romero, the St. Francis permanency specialist, testified that Mother's psychological evaluation was incomplete because she did not take the I.Q. portion of the evaluation. Thus, St. Francis did not have the information necessary to offer other resources that may have been helpful to Mother. Although Mother completed her parenting class, St. Francis was never able to assess whether she could use any newly learned skills because someone was typically with her during visitation with A.W. and taking care of him.

Mother at first attended individual therapy as required. But since Mother left Kansas in April 2018, Romero was unable to explain why Mother was discharged from therapy in August 2018. Mother testified that she knew she was supposed to "keep engaged" in therapy, but she "didn't hear to continue it."

Romero testified that the last visit St. Francis facilitated between Mother and A.W. was about a week before Mother moved to Colorado. Mother's last in-person worker/parent meeting was in March 2018. After Mother moved out of Kansas, Romero could only try to call her. Romero impressed upon Mother the importance of communication as part of the case plan. But she missed three months of communication with St. Francis in 2018. Since January 2019, Mother was not cooperative. Mother testified that she was aware she had not communicated with St. Francis like it wanted her to.

Romero testified Mother had completed no other case plan tasks. Romero did not know if Mother was employed or, if so, how stable that employment was. She did not know if Mother had stable housing. And she did not know if Mother was associating with individuals who may be abusive to A.W. Romero attributed this lack of knowledge to Mother's multiple out-of-state moves and her failure to communicate with St. Francis. Romero testified she could not verify anything Mother was doing to facilitate completion of her case plan tasks.

*St. Francis remained concerned about Mother's mindset.*

Romero expressed a continuing concern about Mother's mindset. Mother's continued association with M.R. and his mother caused concerns over her ability to change her circumstances to assure abuse would not recur. Romero testified that the case plan asked Mother to distance herself from M.R., yet Mother brought his mother to her visits with A.W. Further, at those visits, A.W. expressed his need for an apology from M.R., but Mother "kind of defended" M.R. to the child. Mother had also continued to live with M.R. until she left Kansas. She did not acknowledge M.R. abused A.W. or that the abuse was wrong. Romero testified that she did not know whether Mother's mindset had changed to no longer allow someone who abuses A.W. to be a part of his life.

*Mother's plans*

Mother testified that she was "a little bit" slow and processed things slowly. She graduated from high school in Germany and completed some college in Texas. Her mother was German, and her father was American.

Mother testified she moved to Colorado because St. Francis told her it would take her child after it was born. Romero believed someone at the agency informed Mother that A.W.'s case could result in her being presumptively unfit and that could affect her ability

to keep her baby. Mother acknowledged that it was not certain she would lose her baby, but it was a possibility.

Mother testified she loved A.W. and wanted to continue to be his mother. Her plan was to work for a couple more months in Germany and then move back to Florida to get an apartment and a job.

At trial, Mother suggested she was financially independent. She testified that her mother gave her three homes and a business in the Czech Republic after she graduated high school. Mother then gave the business to her uncle to run. She was paid from a business account after other business expenses were paid. Under cross-examination, Mother testified she did not tell St. Francis about these assets because she was not working for her uncle at the time. She said that she did not think to tell the agency she was receiving business income. In contrast, Mother also testified she told St. Francis she owned property in Germany to support a claim she could support herself, but she did not give St. Francis proof of her claim.

Mother testified she was aware M.R. spanked A.W. the evening before the case began, but she was not aware A.W. had any injuries. She said when A.W. went to school the next morning, "he seemed perfectly fine." Mother testified she had no reason to believe M.R. was a safety threat. She claimed at trial that after the January 2017 incident, she implemented a plan so only she would discipline A.W. When asked if M.R. followed that agreement, Mother testified, "So far." But Mother also testified she only allowed M.R. to remain in the home because St. Francis informed her it was not advisable for her to make him leave; she did not have a job and he was paying the bills. Mother then claimed she told St. Francis she could provide for herself. Yet she let M.R. back into the house. Mother testified she continued to remain in daily contact with M.R.'s mother.

*The court found Mother unfit.*

In its carefully drafted memorandum opinion, the district court found that the State showed by clear and convincing evidence that Mother's parental rights should be terminated because she was unfit "by reason of conduct or condition which renders [her] unable to care properly for the child and the conduct of condition is unlikely to change in the foreseeable future." The district court found there was clear and convincing evidence that:

- there was physical, mental, or emotional abuse or neglect or sexual abuse of A.W.;
- reasonable efforts were made by appropriate agencies to rehabilitate the family, which failed;
- Mother showed a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of A.W.;
- Mother failed to maintain regular visitation, contact, or communication with A.W. or with the custodian of A.W.; and
- Mother failed to carry out a reasonable plan approved by the court directed towards reintegration of A.W. into her home.

Among the factors the district court considered in making its determination was that A.W. had also been in an out-of-home placement for a cumulative total period of one year or longer, and Mother had not carried out her reintegration plan. The district court did not cite a specific statute for any factor in its list for consideration.

Mother raised two issues in this appeal—sufficiency of the evidence and the best interests of A.W.

8

*We hold there is sufficient evidence to support the finding of unfitness.*

Mother contends that there was insufficient evidence to find she was unfit because of conduct or condition which rendered her unable to care properly for A.W., and that the conduct or condition was unlikely to change in the foreseeable future. As part of her argument under this issue, Mother also claims that the district court erroneously applied a presumption of unfitness.

To the contrary, the State contends the evidence was sufficient to support the district court's finding of unfitness. The State also argues that the district court did not apply a presumption of unfitness but used facts in the record to support its finding that Mother was unfit.

The Revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a child in need of care. K.S.A. 2019 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in determining unfitness. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may—but does not necessarily—establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f).

The Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2019 Supp. 38-2250. Besides children in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2019 Supp. 38-2269(a).

When this court reviews a district court's termination of parental rights, it considers whether, after review of all the evidence, viewed in the light most favorable to

the State, it is convinced a rational fact-finder could have found it highly probable by clear and convincing evidence, that the parent's rights should be terminated. See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Mother contends that the State presented no evidence showing that she was unfit. She focuses on two areas.

1.  *Mother claims the district court erred in applying a presumption of unfitness after declaring on the record that it did not apply.*

Mother claims that the district court applied a presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a)(5), based on language it used in its decision:

> "The child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

While the court did not cite a source for this language, it does seem to mirror the language in the presumption under K.S.A. 2019 Supp. 38-2271(a)(5). We do not think that the court did in fact apply the statutory presumption here, rather the court considered how long the child was out of Mother's custody *as a factor* in making its unfitness determination and the best interests decision.

When applying a presumption of unfitness, the burden is on the parent to rebut by a preponderance of the evidence that the presumption applies. If the parent does not succeed, a district court must terminate parental rights. See K.S.A. 2019 Supp. 38-

10

2271(b). A district court is also required to make additional findings to comply with K.S.A. 2019 Supp. 38-2271(b) and K.S.A. 60-414.

Mother argues that the district court's use of this presumption was reversible error because her attorney tried to rebut the presumption in closing arguments, but the district court interrupted and stated, "Let me just cut in here a minute and say the presumption was not presented here or you would have gone first. So you can move on past those parts of the argument."

The language found in K.S.A. 2019 Supp. 38-2269(c)(3) is like a portion of the language in K.S.A. 2019 Supp. 38-2271(a)(5). Factor (c)(3) states, "failure to carry out a reasonable plan approved by the court directed toward the reintegration of the child into a parental home." See K.S.A. 2019 Supp. 38-2269(c)(3).

The language in presumption (a)(5) differs from the factor (c)(3) in two respects. First, presumption (a)(5) includes a length of time that a child has been out of the home under court order. But in cases such as this, that information is always relevant to a district court's determination. See *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009) (discussing "child time").

Both factor (c)(3) and presumption (a)(5) address whether a parent could carry out a reasonable court-approved plan directed towards reintegration of the child into the parental home. The second distinction between the two statutes is in the reason a parent did not carry out that plan. Under factor (c)(3), a parent "fails" to carry out the plan. Under presumption (a)(5), however, a parent "substantially neglects or willfully refuses" to carry out the plan. K.S.A. 2019 Supp. 38-2269(c)(3); K.S.A. 2019 Supp. 38-2271(a)(5). Here, the State points out that the district court did not make any findings based on the presumption, nor did it refer to a presumption in its decision.

11

In its decision, the district court noted A.W. was taken into protective custody in November 2017, and he had been out of the parental home since then. The district court issued its decision in June 2019, which meant A.W. had been in the State's custody for 19 months.

The district court also found that Mother's move from Kansas made completing her case plan "problematic" and effectively terminated her ability to work toward reintegration. The court found that certain case plan tasks were not completed. The district court did not use any language to suggest Mother failed to meet her burden to rebut a presumption. By contrast, the district court did specify a presumption of unfitness applied to A.W.'s father. While the court found that Mother refused to keep St. Francis apprised of her addresses, in context, the district court's findings on whether Mother carried out her reintegration plan more closely align with "failure" as contemplated by K.S.A. 2019 Supp. 38-2269(c)(3), and not the "substantial neglect" or "willful refusal" found under the presumption set out by K.S.A. 2019 Supp. 38-2271(a)(5).

The court did not rely on, or apply, a presumption of unfitness in its decision. The court placed the burden of proof on the State to prove by clear and convincing evidence that Mother was unfit in order to have her parental rights terminated. The district court found that the State had met its burden.

2.    *Mother claims no evidence supported the conclusion she abused or neglected A.W.*

Contrary to Mother's arguments, the evidence was uncontested that A.W. suffered many physical injuries at the hands of M.R. on at least two occasions while in Mother's custody. Mother did not contest the allegations in the child in need of care petition. Further, in both interviews with police following both incidents in 2017, Mother acknowledged that M.R. had a "tendency" to be excessive or go "overboard" when he disciplined A.W. During her November 2017 police interview, Mother reported that M.R.

12

went upstairs to discipline A.W. that evening—routinely—because A.W. was acting out when he should have been in bed. She did not find fault with M.R.'s actions or contend M.R. was not supposed to discipline A.W. It was not until her termination trial that Mother claimed she implemented a policy after the January 2017 incident in which she was the only one who was supposed to discipline A.W. The district court, however, found Mother's testimony not credible. The record shows there was sufficient evidence to support the district court's conclusion that there was physical, mental, or emotional abuse or neglect of A.W. See K.S.A. 2019 Supp. 38-2269(b)(4).

3.      *Mother claims that St. Francis made no "reasonable efforts."*

A review of the reintegration case plan reflects that the agency tried to support Mother to become self-sufficient and gain insight through therapy and parenting skills development so that she could better protect A.W. in the future. The record shows that Mother's failure to complete an I.Q. test prohibited St. Francis from accessing additional resources that could have been beneficial to her and toward reintegrating A.W. into her home. See *In re B.T.*, No. 112,137, 2015 WL 1125289, at *9 (Kan. App. 2015) (unpublished opinion). In *In re B.T.,* the court held that "[T]he mere fact that the services providers did not provide every possible source does not negate the numerous and reasonable efforts that were made for the benefit of this family. The service providers were not under a duty to expend herculean efforts." 2015 WL 1125289, at *9. Mother also left the state about six months after the case began, was uncommunicative, and did not provide any verification of her claims that she was working to meet her case plan tasks.

Mother also claims that St. Francis "refused" to complete two court-ordered Interstate Compact for the Protection of Children investigations, but she does not cite to the record to support this contention. This court may presume that a factual statement made without a reference to the volume and page number has no support in the appellate

13

record. See Supreme Court Rule 6.02(a)(4) (2020 Kan. S. Ct. R. 34). Mother also fails to explain how such an investigation could have been completed when she moved several times during the case, including abroad, and was uncommunicative about her whereabouts. The record reveals that there was sufficient evidence to support the district court's conclusion that St. Francis made reasonable efforts to rehabilitate the family, which then failed. See K.S.A. 2019 Supp. 38-2269(b)(7).

4.    *Mother claims she adjusted her circumstances several times.*

Mother argues she adjusted her circumstances to meet A.W.'s needs when she moved out of Kansas. She claims that she did this to get away from their abuser and protect her son. But the record does not support that M.R. was abusive towards Mother, and it does not show that she made such a claim at any time during the case or at trial. Nor does she explain how leaving the state while her son was in its custody protected A.W. from M.R. Mother's argument here is contradicted by the record. At trial, she testified her primary reason for leaving Kansas was to prevent losing custody of her baby when it was born. This was not done to meet A.W.'s needs. The record shows that there was sufficient evidence to support the district court's conclusion that Mother showed a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of A.W. See K.S.A. 2019 Supp. 38-2269(b)(8).

5.    *Mother claims she maintained regular contact with St. Francis.*

Mother contends that she maintained regular and consistent contact with St. Francis because the agency had her phone number. But the evidence at trial of her failure to maintain contact was uncontested. When Mother left the state contrary to St. Francis' advice, the agency had to actively pursue her for information and updates. St. Francis' communication with Mother in 2018 was inconsistent and was through phone calls and texts. After that point, Mother became even less communicative. The record also

14

indicates that when Mother provided updates, the information was last-minute, partial, outdated, or unreliable. For example:

- she informed St. Francis she was moving to Colorado with only one or two days' notice;
- she told St. Francis only that she would live with a friend;
- when she called with her Colorado address after nearly three months, it was also to inform St. Francis that she was moving again to Florida; and
- St. Francis never received direct notice from Mother that she was moving to Germany.

Mother even acknowledged at trial that she was not as communicative with St. Francis as it wanted her to be.

Mother also argues that once the permanency goal changed from reintegration to adoption, she was "required to do no more." She cites no authority in support of this contention. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Thus the argument is waived.

Additionally, Mother's visits with A.W. after April 2018 were inconsistent and not in accordance with the case plan, but in contravention of that plan. The record reveals that there was sufficient evidence to support the district court's conclusion that Mother failed to maintain regular visitation, contact, or communication with A.W., or with A.W.'s custodian. See K.S.A. 2019 Supp. 38-2269(c)(2).

15

6.     *Mother claims she worked her case plan.*

Mother contends that the district court's finding that she failed to carry out a reasonable court-approved plan for reintegrating A.W. into the home "completely ignores all the work mother completed." She points this court to her completed parenting class, her completed psychological evaluation, and her visitation. Mother argues that the only hurdle that remained was for her to extract herself from M.R., and she claims she was penalized for moving too far away. She laments that the case worker did not provide her with resources for fleeing an abusive relationship.

Again, nothing in the record indicates M.R. was abusive towards Mother. She cites no portion of the record to support her claim. See Rule 6.02(a)(4). Further, Mother mischaracterizes and over-simplifies the requirements of her plan for reintegration. St. Francis acknowledged she completed the parenting class, but noted Mother demonstrated no newly learned skills. Her psychological evaluation was incomplete because she did not take the I.Q. test, which was part of the evaluation. As that portion of the task was unfulfilled, recommendations could not follow. It is unclear what Mother means by visitation, but since her last visit under the case plan was in early April 2018—more than a year before her termination trial—this does not support her claim that she completed her reintegration tasks.

Contrary to Mother's claims of completion of the case plan tasks, she has shown no meaningful actions toward meeting most of the requirements. The record shows that there was sufficient evidence to support the district court's conclusion that Mother failed to carry out a reasonable plan approved by the court directed towards reintegration of A.W. into her home. See K.S.A. 2019 Supp. 38-2269(c)(3).

*Findings about foreseeable future*

The time it takes to accomplish case goals is important in these cases. Indeed, appellate courts are directed to consider the "foreseeable future" from the child's perspective—rather than the parent's—because time perception of a child differs from that of an adult. K.S.A. 2019 Supp. 38-2201(b)(4); *In re S.D.*, 41 Kan. App. 2d at 790. As the court held in *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008):

> "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time."

The district court found that the conduct or condition of Mother's unfitness was unlikely to change in the foreseeable future. Even so, Mother contends this was inadequate. In support of her argument, Mother cites *In re B.E.Y.*, 40 Kan. App. 2d 842, 844, 196 P.3d 439 (2008), for her claim that the district court had to go further and state explicit findings that unfitness is unlikely to change. But Mother cannot rely on *In re B.E.Y.* That case does not require explicit findings to support a court's conclusion that unfitness is unlikely to change in the foreseeable future. Instead, *In re B.E.Y.* articulates a better practice principle that district courts should explicitly state that clear and convincing evidence is the standard of proof employed in making all findings in these cases. 40 Kan. App. 2d at 844.

Still, in this case, the district court supported its conclusion that Mother's unfitness was unlikely to change in the foreseeable future by noting, for example, that J.H. did not appear to have an interest in keeping A.W. safe because he did not support Mother in being accountable or by encouraging her to think differently about how to protect her child. The district court also cited Mother's daily contact with M.R.'s mother, the familial

17

connection to M.R. through their child, and Mother's lack of credibility on her claim that she was not in contact with M.R. The district court also questioned Mother's lack of insight and her deceptions, which the district court noted "does nothing but hurt this traumatized child even more."

A.W. was out of Mother's custody for 17 months before the trial, and a review of the record reveals no verifiable improvement in her condition or environment in that time. The record shows that there was sufficient evidence to support the district court's conclusion that Mother's unfitness was unlikely to change in the foreseeable future, and the district court's reasoning likewise adequately supported that conclusion. See K.S.A. 2019 Supp. 38-2269(a).

In essence, all of Mother's contentions under this issue are an argument for an alternate interpretation or a reweighing of the evidence. Again, however, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Because of Mother's choices before and throughout this case, her lack of communication with St. Francis, and her failure to work towards reintegration, a rational fact-finder could find it probable that Mother was unfit, and that condition was unlikely to change in the foreseeable future. Mother's decision to leave the state, her failure to maintain contact with St. Francis, and her lack of effort to meet case plan requirements regarding self-sufficiency, stability, and lack of insight block any real progress for her.

This issue presents no good reason to reverse the district court's ruling on Mother's unfitness or the unlikelihood of change in the foreseeable future.

*There are no "magic words" for a court to use when making a best-interests finding.*

After a court has found a parent unfit, K.S.A. 2019 Supp. 38-2269(g)(1) requires the district court to then decide whether termination of parental rights is "in the best interests of the child." As directed by this language, the district court gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). The district court makes that determination based on a preponderance of the evidence and is reviewed for abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). In making the best-interests determination, a court must consider the nature and strength of the relationships between the child and parent and the trauma that may be caused to the child by termination, weighing these considerations against a further delay in permanency for the child. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Mother contends that the court committed reversible error by failing to consider the best interests of A.W. when deciding to terminate Mother's parental rights. She argues the district court "never once mentioned" what was in A.W.'s best interests. The State disagrees and argues that the district court considered what was in A.W.'s best interests when it terminated Mother's parental rights, despite not using the specific language "best interests."

This issue is within the sound judicial discretion of the district court. *In re R.S.*, 50 Kan. App. 2d at 1115-16. Thus, we review the best interests decision for an abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal frame work appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Mother does not claim that the district court abused its discretion, but that it "never mentioned that it considered the physical, mental and emotional health of the child and whether those needs would be best served by termination." Mother argues that the district court's failure to articulate "best interests" language means that the district court failed to consider "best interests" factors. Mother essentially asks us to require a district court to use explicit language to show it considered the physical, mental, and emotional health of the child, as required by K.S.A. 2019 Supp. 38-2269(g)(1).

Another panel of this court, in *In re B.E.Y.*, acknowledged that the district court failed to include express language that the children's best interests were considered, noting that the better practice was to expressly include this language. 40 Kan. App. 2d at 844. But such express language is not required. A court's failure to use it does not mean the court abused its discretion, nor does it warrant reversal—particularly if the record supports the court's determination. See *In Interest of J.D.*, No. 116,895, 2017 WL 2494809, at *3 (Kan. App. 2017) (unpublished opinion) (citing *In re B.E.Y.*). We agree with the reasoning used in these cases.

The district court's decision provided details of A.W.'s physical injuries. The court discussed the negative impact Mother's decision to leave Kansas had on her ability to reintegrate with A.W. The court found Mother's clandestine contacts with A.W. were a disservice to them both because the contacts were not part of the reintegration plan or aimed at lasting reintegration, and gave A.W. false hope. The district court also noted that Mother's lack of accountability and failure to think differently about how to protect A.W. undermined his safety. The district court found by stating the goal of the case was to remove A.W. from an unsafe situation and help Mother learn how to protect and nurture him.

The decision shows that the district court actually considered A.W.'s physical, mental, and emotional health, despite failing to explicitly say so. The district court did

not err. The record supports the district court's finding that termination of Mother's parental rights was in the best interests of A.W.

We find no reversible errors.

Affirmed.